Good morning, Your Honors. Elisa Solano-Peterson for the appellant, Marco Joshua Perez. Your Honors, this case involves an illegal traffic stop, which led to an illegal search of the defendant's vehicle, which in turn led to the illegal seizure of the defendant in his home, and then the illegal entry into his home, and then another illegal search of his residence. Although this is not chronological, I would like to start with the illegal entry into the defendant's home. In regards to entering the defendant's home, it's the government's position that, pursuant to the Bouche case, the police had the authority to enter his home because the defendant had some outstanding misdemeanor warrants. The point to remember, however, is that the arrest warrant exception is a limited exception that allows police officers to enter a dwelling when there is reason to believe that the suspect is within. And in this case, it was obvious the suspect was not within the dwelling except at the doorway. There was absolutely no reason for the police to proceed into the interior, several feet into the interior of the defendant's home. Didn't they try to grab him while he was in the doorway? Well, what happened is this. The police could easily have told the defendant, please, we order you to step outside. Step outside. We're going to arrest you on these warrants. The police could have told the defendant, put your hands up and turn around so we could see your rear waistband. The police didn't do any of those things. They could have handcuffed the defendant at the doorway, telling him he was under arrest. But actually, they didn't do any of those things. Instead, Officer Segura suddenly grabbed the defendant unexpectedly, which caused both of them to tumble into the house. And there was absolutely no necessity for that kind of action. And it says in the record that as the defendant was reaching to grab his driver's license from Officer Segura, the officer spun around the defendant's left side and grabbed his rear waistband with his right hand. This type of sudden action would most likely cause someone to lose their balance and flare their arms around. And therefore, it was basically an officer-induced scuffle. And on top of it, the district court did not really give credence to the fact that the defendant may have hit the officer because the district court could have imposed a sixth-level enhancement because he attacked an officer. But the district court refused to do so because it said there's nothing in the record that he was charged with anything like that. And it could be assured that if he actually had assaulted an officer, that there would have been some charges stemming from that. And even the record itself and Officer Segura's testimony, he basically said that the defendant just slapped his hand away. And he said, you know you are on parole, dude. If we really want to violate you, definitely just by this, by you slapping my hand away like that and then causing us to come in here and fight with you, we can violate you right now. So that's basically the situation that happened where the defendant was standing in his doorway. They could easily have arrested him by asking him to go outside or handcuff him or do some other thing that didn't require them to fall into his home. And then to make it worse, because they were already there, then they decided to do a protective sweep, which was a further intrusion of the defendant in his home. And the problem with a protective sweep is that there is no legitimate reason for the police to be in the home to begin with. And the protective sweep doctrine basically applies when the police are lawfully in the home. And then in that case, they can do a quick sweep of the premises. Here they were illegally in the home, and then they did a sweep of the premises. There's also a problem because the court said that there was not conclusive evidence that the garage was directly adjacent to the living room. And, in fact, in the record, it says that the garage was just off the kitchen, adjacent to the kitchen. So the protective sweep where you look at adjacent areas wouldn't really apply to the garage, which is where most of the drugs were found. And there's no indication that there were people lurking in the garage at 5 a.m. in the morning waiting to attack the police because nobody knew the police were coming into the home. There was just no indication that there was that kind of emergency. The only problem that occurred in the home was caused by the police officer. And then in regards to the Terry stop, the courses of the cases of the circuit say that Terry stop does not apply to a defendant's home or in his residence. There may be a limited exception where the police are already lawfully in the home, and then they do a Terry pat down of the defendant. But as I've said earlier, the police were not lawfully in the defendant's home. And then in terms of the traffic stop, the traffic stop also indicates Officer Segura's tendency to play with the facts to justify what he's done because he's done something illegal, and then he wants to justify it by playing with the facts. Because just like with the pat down of the defendant where they said he was fighting with them and it really looks like he was not fighting with them, with the traffic stop, it starts out with Officer Segura saying that he spotted Garcia driving defendant's pickup going north on Lowell and he somehow saw the seatbelt, male part of the seatbelt dangling from the seatbelt post. But in reality, if Garcia was going north on Lowell and the officer was just going in the easterly direction, he was coming out of an Albertson's driveway and he was facing the defendant perpendicularly going in the easterly direction and it was 149 a.m. in the morning, it would really be hard to see how he could have seen the post. The problem with that argument is the district court credited Officer Segura's testimony. I understand that there's a lot to overcome, you know, with that argument, but I just mention it because it shows this playing around with the facts. Let me ask you a question. Mr. Perez was on probation or parole? Yes, he was. And what was the condition of the probation or parole? Were they allowed to search his house? That was never established and they certainly didn't know it at the time and that's why the district court said that that wasn't going to apply because they didn't know that he was actually subject to any conditions at the time. Thank you. And then we come to the search of the defendant's vehicle and again we have questionable facts where Officer Segura says that he requested Garcia's permission to search the car, but what Officer Segura actually said is that I'm going to look inside and then Garcia made an ambiguous response saying basically it's not my car, but go ahead, I can't do nothing about it. I can't say nothing about it. Right. And what he really meant is there's nothing I can do. It was his testimony later that it was his attitude that the officer was already being aggressive with him, he had already pushed him against the car and the officer was going to do whatever he wanted so he certainly wasn't going to actively fight him, he basically said there's nothing I can do or there's nothing I can say, nothing I can do. And in terms of the fruits of the poisonous tree argument, although the defendant and his wife did give their consent in U.S. v. Washington, a later obtained consent does not dissipate the taint of a prior legal police conduct. So here, although they gave their consent later, that really doesn't matter because it doesn't get rid of the taint. And so it's the defendant's position that basically all the evidence was tainted, starting with the traffic stop, the information about the defendant would not have happened if there was no traffic stop, they never would have gone to the defendant's house, and obviously if there wasn't the legal entry into the house, they wouldn't have spotted this cooler in the garage and then gotten his later consent, invalid consent, and then looked inside the cooler and looked at the rest of the house. I'd like to reserve anything. Thank you, counsel. Thank you. May it please the Court. Amanda Bettinelli on behalf of the United States. The district court did not clearly err in finding and denying defendant's motion to suppress evidence recovered during both the search of his vehicle and his residence. Specifically with responding to the issue of consent, this Court need not even go to the question of consent with respect to the traffic stop because the items that were recovered, the two pieces of evidence, which were the navigational system, which was in plain view on the dashboard, which was supported by the record, which is at ER 10, footnote 8, and also Segura's declaration at paragraph 4. Officer Segura observed the defendant's address fully illuminated in the GPS before the vehicle was searched. In addition, the cell phone, which contained the photographs that were of the cooler and the incoming drug trafficking text messages, belonged to Garcia himself, and the defendant has no standing to object to that. Then on the plain view business, was it plain from the outside of the car? That was in the declaration of Officer Segura, yes. He said when he approached the vehicle, he was able to see the illuminated GPS with the defendant's home address on it. They ran a title check on the vehicle too, didn't they? Yes, they did, Your Honor, and the registration matched the address that was illuminated, which was defendant's home address. Now, with respect to the search. Now, if they observed the defendant's home address as the owner of the vehicle, what reason would they have to go to the owner's home address? Would they have any knowledge of any wrongdoing other than driving without a seat belt? Your Honor, yes. The concern at the time, because as the they had conducted, Officer Segura had conducted the traffic stop, and they wanted to verify, as was the testimony of both Sergeant Pisacci and Officer Segura, they wanted to verify Garcia, the driver of the defendant's vehicle, that he hadn't stolen it. That was their concern at the time. So they actually had gone to the defendant's home, which was about 10 minutes away from the Albertson's traffic stop, to verify that the vehicle did in fact belong to Perez. However, beyond that, they didn't need to do that. They could have also verified that through the registration, which they were able to run and verify the home address. And in addition, they were able to look at the information to get to the home, I should say. They were also able to look at the illuminated address, and that would also have led them to the home. That doesn't make sense. They thought, why would he have the home address on the navigational system if he was stealing the car? They didn't know at the time whether or not he was telling the truth regarding how he had obtained the vehicle. What had happened was there was a number of, I'll give a little bit of background based on the record. Garcia had been questioned by the officer regarding several things. One, how did he come into possession of the vehicle? He said he had obtained it from his friend, Marco. He failed to give the last name. When he was questioned, they had asked him to. He couldn't find his own proper driver's license. He only had a California identification instead of an actual driver's license. He wasn't immediately able to present the registration for the vehicle. Officer Segura was concerned about his behavior, and he had said, you know, where are you going? How did you obtain the vehicle? He said, I just picked it up for a friend in Whittier, and I'm delivering it to his house. And so as the interaction unfolded, which was all available to the district court by means of the recording and also by means of the testimony of both Segura and Garcia at the hearing, suppression hearing, what the officer basically said was there was concerns regarding the accuracy of Garcia's story, whether or not he was telling the truth. And after he exited the vehicle, he was also patted down, and in his wallet there was a Post-it note which contained information pertaining to another police case. And when Segura had questioned Garcia regarding that police case, he told him it pertained to a hit-and-run matter. Segura, again, didn't believe him and called the Whittier Police Department and found out that the case actually pertained to another drug narcotics trafficking case that Garcia had recently been arrested for. And so on the facts of this specific case, it's not strange that they would feel the need to verify the particular accuracy of what Garcia was telling them regarding whether or not the car was stolen or if he had, in fact, been permitted to use it by his friend. You said that the defendant has no standing to challenge the search of the cell phone because it wasn't his cell phone. Correct. But if he had standing to contest the search of the vehicle that would never – which was a necessary precondition to finding the cell phone, could he then object to the cell phone? Your Honor, the district court found in this case that the defendant would have had authority to challenge the search of the vehicle, yes. Right. And – but that Garcia had the apparent authority to authorize and consent to the search of the vehicle, yes. Yeah. Well, I understand that. If the consent's good, then that's – Right. And so on these facts, and it was not clear error for the court. But I guess the question I was getting to, if we found something wrong with the consent to the search of the car, wouldn't that permit him to keep out the search of the cell phone as the fruits of an improper search of the car? If you were to find that the consent was illegal or invalid, yes, you could challenge it on that particular basis, Your Honor. Your argument is that it doesn't matter. It's irrelevant whether the consent is irrelevant because the search is irrelevant. Is that the argument? Correct, Your Honor. We don't need to get to the question of consent because the GPS, as was stated in the district court as well, the GPS proper was in plain view on the dashboard and illuminated with the defendant's address there. And that address was also independently corroborated by the registration, which was run. And then separate from that is the cell phone, which is the other key piece of evidence, which pertains to the drugs. Wait a minute. What about the license? I mean, the license plate? Did they run the license plate? They ran the registration for the defendant's information. But that's the registration they obtained by the search of the car. The registration, they actually never pinpointed specifically when they found it because there's conflicting testimony regarding when they located that. But the registration and the plates were both run by Officer Segura and matched and led to defendant's residence. And that would have been found just as a matter of routine questioning and information pertaining to the, and that information was requested of Garcia when the vehicle was stocked with respect to whose vehicle is this. And he said, it's not mine. And he was looking for both the insurance and the center console was his testimony, and then also the registration, which he had said was in the glove box. Who was looking for it? That was Garcia's testimony. And Segura had said that he had independently run the information for the registration and the license plate to verify the ownership of the vehicle, which was coming back to Marcus Perez, the defendant in this case. And the registration was given by Garcia to the officers? Yes, it was, Your Honor. When the officer was outside the car? You know, unfortunately, the record isn't clear on that particular point. I've actually, there's conflicting testimony regarding the timing of that. But just as a matter of routine, you know, at a traffic stop, that's part of the information that's requested, and that would have been verified as defendant later verified at the door that it was, in fact, his Dodge Ram vehicle. I suppose if they ran a search on the license plate, they didn't apparently. But if they had, presumably that would have led to the address also. Correct. Everything would come back and have led back to defendant's accurate address and information, which is the line near address in Sunland, California. And then if I could respond also to the questions pertaining to the entry into defendant's homes, which was raised by a defendant in the oral argument presented today. The district court found, and it was not clear error, that the officers were lawfully present at defendant's doorstep, one, initially to verify the identity of the, that he had, in fact, loaned out the vehicle to Garcia. What time was this? Arriving at the defendant's residence? Yeah. That was at approximately 5 a.m. So they went at 5 a.m. to see whether he owned the vehicle, but somebody without a seatbelt was driving. That's correct, Your Honor. What a wonderful thing it is to have such efficient, concerned police. Your Honor. Especially when you don't have a seatbelt on. Your Honor, I appreciate the point. I think there was additional information that was provided by both Officer Segura and Officer Pisacci regarding their concerns about the veracity of the story that was provided by Garcia. And so, well, he was. Well, and also there was the pictures from the search of his cell phone. That's correct, Your Honor, which pertained to the cooler with the methamphetamine as well as, or what appeared to be methamphetamine or cocaine, as well as the incoming text messages regarding drug transactions that were coming into cell phone for Garcia. The cell phone, those contents were, became part of the evidence? Yes, Your Honor. And, in addition, the full recording of the traffic stop. If that was not valid, if the search was not valid, the consent was not valid, then you say it doesn't matter because they had the, they could have run the license plate, which they didn't, but they had the information as to whose car it really was from the registration. That's correct, Your Honor. So if they had the information that he had no seat belt on and it wasn't his car, but it was a friend's car who had asked, authorized him to use it, would that have caused them to go to the house at 5 in the morning? Your Honor. See whose car it was? Your Honor, on these facts, what they knew at the time when they stopped the vehicle in the district court family, that it was a valid stop and there was a creditability finding attached to it. Yes, I said assuming the man wasn't wearing a seat belt. Right. And they stopped him and he said it was his friend's car. Yes. And they found out, find out where his friend lived. Would that have been enough to go to his house at 5 in the morning to wake him up to see whether it really was his car? That would be insufficient, likely. On these facts, however, because we had all of the additional information. All the information that came from the search. The cell phone, which the defendant doesn't have standing to challenge, the pat-down, which, again, recovered information. He doesn't have standing to challenge an illegal search of his car or the product of it? Your Honor, I'm referencing the defendant didn't have standing to challenge the cell phone search, the cell phone belonging to Garcia. But the cell phone was in the car, right? The cell phone was on the driver's front seat, and after he was asked to exit the vehicle when backup arrived for Segura, Officer Segura testified that he saw the cell phone on plain view on the seat, and he had asked the defendant, Garcia, excuse me, to step out of the vehicle to conduct a pat-down. When he did, he found the right bulge in his pocket, which was approximately $3,900 cash. He also found the wallet, which was in the rear pocket, which contained that post-it note which pertained to the Whittier case that he later verified was a drug trafficking case. So on our facts, I think it's reasonable that they would have gone and done subsequent investigation. I appreciate the point, though, that with less information on different facts, it might not have been warranted. But he did have – he said he didn't have standing to challenge the cell phone seizure. Cell phone. Why is that? The cell phone seizure depended on consent, didn't it? Not necessarily, Your Honor, because the defendant was asked – the driver was asked to exit the vehicle. Forget the consent. I'm talking about standing. As far as standing, if something's taken from his car in an illegal search – The defendant does have standing. Would he not have standing? Yes. The defendant would have standing to challenge if he thought that there was – separate facts, if there was a finding that there was an invalid search. Yes, the defendant would have standing. That's all I was asking about. I understand. He wouldn't have standing to challenge the cell phone. Right. I must have misunderstood your question. I apologize. So, yes, he does have standing to challenge the search of his vehicle. I was merely pointing that he didn't have standing to challenge the cell phone. I apologize. Well, if the cell phone was obtained through the search of his vehicle, wouldn't he have standing to challenge that? I think on our – yes. But I think on our facts, the testimony of Segura and also of Garcia was that the cell phone was on his front seat, which was – I'm assuming that. Right. If they took the cell phone from his car, whether they saw it or not, doesn't he have standing to challenge the seizure of the cell phone, the product of an illegal search of his car? Yes, but the cell phone did not belong to this defendant. The cell phone belongs to him. No, no, I understand that. Okay. They don't – it's a product of a search of his car. Right. Right. Right. So that's going back to supposing that Garcia's consent was invalid. Right. That's the assumption. Right. I understand that. Assuming the church was – The district court found differently. So assuming that – You know, I understand what the district court did. I only asked you whether he would have standing. Yes, he would. Well, I assume your point might be – or one point might be that if the search of the car was valid and the defendant had owned that cell phone, he might have been able to argue, look, a search of the car does not include opening up a cell phone and seeing what's inside it. And you would say, well, he can't raise that kind of an issue now because he doesn't own the cell phone. Correct. Okay. But as – but if we have problems with the original search of the car, then that's a different issue and it would include the contents of the car. Yes, Your Honor. Okay. But, again, returning to the – what we had – the court had before it based on the totality of circumstance, which is the standard for assessing the consent. Judge Schneider did have before her both the full recordings, which were included as part of the exhibits and in evidence from the reply, which is at Exhibit C for the defendant. And then, in addition, she had both Garcia and Segura and Pisacci testifying pertaining to the actual traffic stop. She had a full pamphlet of evidence and information before her to assess the information. In addition to that, she was able to – she did, in fact, make a credibility finding as to Officer Segura, one with regard to the – Well, what's the standard review for whether the consent was voluntary? Is that de novo? I think that's correct, Your Honor. With respect to the overall – let me just verify that. If I have a moment, I just want to make sure I have it correctly. I understand the review findings of fact as to whether or not they're clearly erroneous, as to whether the factors related to voluntariness. Right, the voluntariness. That's correct, Your Honor. So those five factors would be subject to de novo. The factual findings of the court, though, would be subject to clear error. And with respect to the issue of revocation, which was, again, addressed by – it wasn't completely raised in the papers by the defendant, but the district court did respond to the issue at Excerpt from Rector 9 and 10 and said that there is no retroactive revocation after the finding of evidence in that particular reference. She was addressing the navigation system and specifically going on to the search of the residence or the actual presence of the officers at the residence. The position of the government in the finding of the district court was that it was not clear error for the court to find that the entry into the defendant's residence was not only lawful based on the outstanding misdemeanor warrants, but was necessary due to the fact that the defendant at all times, and it was the defendant's testimony that he was standing in his residence at all times, and he testified to that effect at Excerpt of Record 91 and page 106, where he said he never stepped out of his house, he never left. And, in fact, the facts of this case are such that there was an altercation at the door and that the defendant struck the officer and that they, Officer Segura and the defendant, fell further back into his residence as the defendant was observed repeatedly striking Officer Segura, as was testified to by Officer Pisacci, as well as Officer Boudreau. And further, the, within minutes of falling into the residence, into that living room area, two other individuals came into that area, which was the testimony of Detective Pisacci regarding the safety of the officers. And within that time, as they were trying to restrain the defendant who was resisting and who was not complying, there was a valid concern that was reasonable articulable suspicion that there were other people who were in the home that could potentially harm the officers. And the protective suite ensued within minutes after the defendant was actually handcuffed. And the other two individuals had come into that common area, and then they, there were actually two prongs, as was set forth in my papers, regarding Marilyn V. Bowie, which is that the, when there is a reasonable articulable suspicion regarding whether or not there might be other people present in the home that could pose a danger to the officers, that the area that could be swept can be broader than the immediately adjoining areas. And so that was also the finding of the district court regarding whether or not the protective suite was valid. And she did so find that it was valid based on the presence of those two individuals entering into that area once the officers had entered into the home and also the testimony of Pisacci. And one of the other items that you had asked about pertaining to the parole status of the defendant, he was on active parole for weapons violations. And he had also been noncompliant at the entry in the doorway, where there was a repeated request to show his hands. And he had repeatedly, as he also testified, put his hands behind his back. And it was later found that he was holding a cell phone, but the officer had testified they were not sure. Specifically, Segura testified he was not sure if he had had a weapon in his rear waistband or something else. Is it correct that they were not aware that he was on parole in the time that they had a right to enter? Your Honor, they did know. They had actually run his driver's license or California identification prior to entering into the residence. They did verify that he had both the outstanding, two outstanding misdemeanor warrants as well as the parole status. And they learned that from the dispatch call, which was entered into evidence in this case. And does that mean that they knew he was on parole and that they had a right to enter? They knew that he was on parole. They did not know that he had search terms. And I think that's the question you're asking? Yes. I'm sorry, Your Honor. They did not know at the time, and that's something that was not fully developed. They just didn't have that information as a result of the dispatch call. All right. Thank you. You're welcome. And if there are no further questions, the Governor will close. No, we're way over. Okay. Thank you. Your Honor, first of all, in terms of the fruits, I just want to emphasize that the cell phone is the fruit of the legal search, so it doesn't matter whether you have separate standing to, you know, challenge, you know, what was found in the cell phone. I think we get that. Yes. What I'm curious about is that, I mean, I think this whole thing stands or falls on the voluntariness of the initial consent by Garcia. Right. One of the issues there is whether he actually had actual or apparent authority to consent, because the only thing that the record reflects is that he was driving this car to the defendant's home from a shop for the limited purpose of, you know, just delivering it to him. That doesn't really show that he had, you know, joint equal access to that vehicle. So that's a problem. And, in fact, he said, this is not my car. Words to the effect, you know, it's not my car. Of course, he has total access to the vehicle at the time he stopped. He's got the keys, got the whole thing. He's totally in control. The vehicle definitely. There was no one else in the vehicle. There were two different questions. One question is, does somebody who is driving a car and is the sole occupant of the car have the authority to consent? That's different from the question Judge Wardlaw raised, which is, even if he has the authority to consent, did he give a voluntary consent? Well, that is all. But let's separate those two questions. Right. That's obviously the first question is whether he gave voluntary consent. And here it is very questionable, because he gave a very ambiguous. It's past the time for questionable. Pardon? I said it is past the time for questionable. He did not give voluntary consent. All he did was say that let's say his exact words. I think he said, go ahead. Yeah. Well, he said. That's not my car, but go ahead. I can't say nothing about it. Right. That's what he said. Yeah. That's exactly what he said. He didn't say. The officer said, I'm going to go ahead and look inside. Right. You have a problem with me searching your car. That's not my car, but go ahead. I can't say nothing about it. That's the exchange. So is that knowing involuntary consent? Because he could say something about it. No one explained to him that he. Right. Could say something about it. He had the right not to say no. That's right. That's right. As far as he was concerned, according to his testimony, he felt that there was nothing that could be done. And it was also based on the fact that the officers were looking in his other things, his wallet, his cell phone, and he said, I didn't, you know, I didn't say you could give you permission to, you know, look at this, but they're already looking at his stuff. So he just felt that. Well, whatever he felt is there are five factors, as the government pointed out. One of them is whether the defendant was notified that she had a right not to consent. And I think you both agree on some of those things. I think you both agree he was not notified that he had a right not to consent. That one factor I think you both agreed on, whether the factors are, that's one of five, and there really hasn't been too much argument about the five factors. I don't think there's any doubt about what they are, but what the facts were hasn't been discussed. All right. That's one issue that may or may not be relevant, according to the government. It doesn't matter, because they say their case does not depend on anything discovered during the search. But those women, there were three different things, whether he has the authority to consent, whether his consent is voluntary, which was an issue Judge Wardlaw asked about, and whether it matters if the government can do whatever it did without anything discovered in the car. Right. Well, to elaborate. But the question Judge Wardlaw asked you about was the middle one, whether the consent was voluntary. Right. Well, there are other problems with that, because although we're not challenging Garcia's Miranda rights, he repeatedly did ask for an attorney. He was restrained. He was restrained. Well, if you're not challenging Miranda rights, that's fine. We're talking about the validity of the consent. Right. Because that's one of the factors that you would consider, whether he was given his Miranda rights. Well, if you're challenging the voluntariness of the consent, and that's one of the factors, I don't quite understand what you're saying. What I'm saying is, basically, you're looking at the situation. The factors are to be looked at to see, basically, whether he really, whether there was coercion of some type and whether his consent was fully voluntary. And here you have a situation where he repeatedly asked for an attorney. He was denied his request. He had trouble with his legs because he was a diabetic, and the officer said, you can't get up. You know, you can move your legs a little, but you can't get up. Was he in custody? Pardon? Was he in custody? Well, that's a very good question. It certainly is a good question. He was in custody. But are we prepared to give us the answer? The answer is yes. Okay. It is in my briefs. Yes, he was in custody. Yes. As said in the briefs, he did not consent to the search. And then the other issue, obviously, is whether he had. So on the question of whether it's relevant, the only thing that could possibly make it relevant to the approach to the residents is the fact that they saw the drugs and searched the phone and saw the drug conversation on the phone. And that's what led them to go to the house. Well, there's something very questionable about the whole thing. You know, I don't. Because basically, if it wasn't, first of all, if it wasn't for the stop, they wouldn't have found any information about the defendant at all. Right. But I think we're over the stop. Right. And then when we come to what was searched, basically after he commenced his search, they found the cell phone. And although they say the GPS was in plain view, actually it was only after Garcia was removed from the vehicle, in order to conduct the search, did they find the GPS, notice the GPS, because I believe in the record it says, you know, after they were commencing the search, you know, then they saw the cell phone on the seat and they saw the GPS. And Garcia is 300 pounds apparently, so it would be kind of hard if he was sitting right there in his seat to be able to see any of those things. But then he was removed from the situation because they were going to commence the search, and that's when they found those things. And even if they were able to do some kind of a check on the defendant's plates, it really wouldn't matter. It wouldn't mean anything without the information on the cell phone, because the cell phone showed drug activity, and it's doubtful that they would have gone to the defendant's house at 5 in the morning just to check and see if it was the owner. The guy said that the defendant's name was Marco, and that was on the registration. So it didn't really sound like a very suspicious story until they found the cell phone. All right. Thank you, counsel. Thank you, Your Honor. The case is arguably submitted.
judges: Canby, Reinhardt, Wardlaw